UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MARTHA L. BRYANT,              )
                              )
        Plaintiff,             )
                              )
    v.                         )        Case No. 3:05-0840
                              )        Judge Echols
                              )
DOLLAR GENERAL CORPORATION,    )
                              )
        Defendant.             )

## MEMORANDUM

Pending before the Court is Defendant Dollar General Corporation's ("Dollar General") Motion for Summary Judgment (Docket Entry No. 18), to which Plaintiff Martha L. Bryant ("Bryant") has responded in opposition (Docket Entry No. 26) and Defendant has replied (Docket Entry No. 29).

## I.  FACTS

Bryant brought this suit alleging violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA") after she was terminated from her employment as a Senior Programmer Analyst for Dollar General.  Construed in Plaintiff's favor, the facts underlying her employment with, and termination from, Dollar General are, in rough chronology, as follows.

1

Bryant was hired by Dollar General as a Senior Programmer/Analyst in July 2001. (Def. SOF ¶¶ 1 & 2).[1] Plaintiff was interviewed for the position by Tonya Tucker ("Tucker"), who became Bryant's immediate supervisor. (Id. ¶ 3). Tucker, in turn, reported to Pamela Campbell ("Campbell"), who was the Director of Systems Development subsection within the Information Services ("IS") Department. (Id. ¶ 4). There were approximately twenty-five employees in Campbell's department. (Campbell Depo. at 4).

In 2002, Dollar General provided employees with the opportunity to go to a health fair sponsored by Vanderbilt Hospital. (Def. SOF ¶ 5). This was a voluntary program and employees who attended could have their blood sugar and blood pressure measured. (Id. ¶¶ 6-7). Bryant attended the fair and was later telephoned and told that her blood sugar level was elevated and she needed to see a doctor immediately since she might be a diabetic. (Id. ¶¶ 7-9). Bryant visited her doctor and learned that not only was she a diabetic, but that she had high blood pressure as well. (Id. ¶ 10).

In October 2002, Bryant also learned she had a "heart condition" in the form of "heart rhythm problems" which she describes as pressure or the feeling of "butterflies" in her chest. This condition causes her heart to race or skip beats and leads to

---

[1]References to statement of facts ("SOF") are to such statements when undisputed.

2

shortness of breath. Bryant takes prescription medicine for this condition. (Bryant Depo. at 85-87).

Bryant kept Tucker abreast of her medical conditions since, at the time, the two were friends. (Def. SOF ¶¶ 12, 14). Bryant believes Tucker was legitimately concerned for Bryant's well-being and was supportive at the time Bryant learned of her condition. (Id. ¶ 14). Even after Tucker became aware of Bryant's health problems, Bryant's performance reviews remained "very good." (Id. ¶ 15).

In early 2004, Bryant became involved in the Distribution Center Transaction Project ("DCT Project") which entailed converting the computer language system that tracks the inventory of goods in the Distribution Centers. (Def. SOF ¶¶ 16, 18). As part of this project, programs for tracking inventory at the Distribution Centers had to be written in Oracle, and then those programs had to be tested. Bryant worked on this project with several co-workers and the project manager was Jeffrey Joseph ("Joseph") who was later replaced by Tucker. (Id. ¶¶ 19-21).[2]

In April of 2004, Campbell attended a training session in Human Resources which covered FMLA leave in which she learned that in addition to long-term leave, an employee could take leave on an intermittent basis. Campbell told Bryant, along with another of

---

[2]By this time, Leonard English ("English") had replaced Tucker as Bryant's direct supervisor. However, while working on the DCT project, Bryant reported to Tucker. (Id. ¶ 22).

3

her employees, Rhonda Austin (who suffered from migraine headaches) that they might be eligible for such leave and they should visit the Human Resources Department. (Id. ¶¶ 22-24). Bryant claims that when Campbell talked with her about intermittent leave, Campbell stated that "we should have done this before," apparently a reference to Bryant's diabetes diagnosis in 2002. (Id. ¶ 27).

After speaking with Campbell, Bryant went to Human Resources and spoke with Diane Short. Short gave Bryant some paperwork for her doctor to fill out and then explained the FMLA to Bryant, telling her she could use FMLA leave for doctor's appointments and testing related to her diabetes and heart condition. (Pf. Depo. at 83-85). It was Dollar General's idea that Bryant complete FMLA paperwork in April 2004, not Bryant's. (Def. SOF ¶ 31).

Bryant had a vacation scheduled for the first week of May 2004. Prior to her taking this vacation, Tucker and English had a conversation with Plaintiff about meeting deadlines. (Id. ¶ 37).[3] Tucker believed Plaintiff had missed at least two different deadlines for reports, even though those deadlines had been extended. Tucker also was concerned about another report but Bryant explained that she had not been provided the information necessary to complete the report. (Tucker Depo. at 15-16; Bryant Depo. at 63-70).

_____

[3]Tucker and English also had several discussions with other employees about meeting deadlines.

4

Bryant's last day at work prior to her scheduled vacation was April 30, 2004. (Id. ¶ 36). On that day she and several co-workers were to work as a team on part of the DCT project in a conference room which was dubbed the "war room." The employees were instructed by Tucker not to leave before the project was completed. (Id. ¶ 45).

While the employees were working in the war room, a heated exchange erupted among several of the employees, including Bryant. (Id. ¶ 42). The argument was loud enough that others could hear the exchange outside the war room.

Two of the employees, Libby Elizer ("Elizer") and Debbie Mays ("Mays"), believed they had already completed their tasks on the project but Bryant had not completed her work. (Id. ¶¶ 45, 46). Mays expressed to Bryant her view that she did not think it was fair that she had to stay late to do work that was not hers, but instead was Bryant's work. (Id. ¶ 47). Bryant responded by stating she "was tired of this mess," and that she was "sorry that you are blaming it on me when I didn't tell you that you had to work late." (Id. ¶ 48). Because progress was not being made on the project, Joseph told everybody to go home. (Id. ¶ 49). Plaintiff went home and began her scheduled vacation. (Id. ¶ 50).

The following Monday, May 3, 2004, Joseph, Mays, Elizer and another employee went to Tucker to discuss with her the events of the previous Friday. (Id. ¶ 51). Although the parties dispute

5

whether it was reported to Tucker that Bryant had started the argument, Tucker believed Bryant had started the argument and then continued the argument with Mays after Mays had backed down. (Tucker Depo. at 47, 53).

On May 7, 2004 (while still on vacation), Bryant turned in completed FMLA paperwork. She did not tell either Campbell or Tucker the amount of FMLA leave she intended to take because she did not know the amount she would need to take, and, in fact, was not planning on using such leave at that time. (Id. ¶¶ 32-34).

Upon Bryant's return to work, she was placed on a written progressive counseling. (Def. SOF ¶ 55). Mays, however, did not receive any written counseling.

According to Tucker, Bryant was counseled about her involvement in the argument and her missing deadlines. (Tucker Depo. at 46-47). Bryant claims she was counseled about her "personality problem" for participating in the argument and for leaving work the afternoon of the argument without finishing the project. (Bryant Depo. at 108). Bryant refused to sign the written copy of her progressive counseling. (Def. SOF ¶ 59).[4]

English began a log of Bryant's activities which he titled "Marty Bryant's Progressive Counseling" which recorded discussions management had with Bryant. The log also tracked the time Bryant

---

[4]In writing her up, Bryant claims that Dollar General skipped two steps in its progressive discipline policy. (Pf. Response to Def. SOF ¶ 60).

was away from work for her medical conditions and included entries such as "out sick," "to the ER for chest pains," "running a EKG & CT to make sure she wasn't having a light stroke," "going to the doctor's office during lunch. She returned with a doctor's excuse from work to be out for 3 days," and "going to the doctor before she came into work." That log also indicates that on the day following the written progressive counseling session, Tucker and English met with Bryant and "stressed that she should focus on getting the work done and fill out the worksheet for FMLA." (English Depo. Ex. 2).

On May 19 to May 23, 2004, Bryant took FMLA leave for her elevated blood pressure. At some point around this same time frame, Tucker learned that Bryant had been discussing her progressive counseling with her co-workers.[5] Several employees thought that discussing progressive disciplines was not a big deal since it was not uncommon for employees to discuss progressive discipline among themselves. (DiStefano Depo. at 33-37; Dishman Depo. at 14-16).

Tucker told Campbell what she had learned. Campbell did not believe Bryant should have discussed her progressive discipline

---

[5]The parties dispute whether Tucker approached the employees or the employees approached Tucker. That dispute is irrelevant for present purposes, except to the extent that it could show Bryant was treated differently than other employees because, unlike others who received progressive discipline, an inquiry was made about whether Bryant talked about receiving discipline to her co-workers.

with co-workers. Tucker, English and Short then met with Bryant and Bryant was told that she was to keep her progressive counseling confidential. (Def. SOF ¶¶ 69-72; Bryant Depo. at 132-133).

On May 27, 2004, within a few days of that meeting, Bryant told Stephen Dishman, a co-worker, that she had been instructed not to speak about her progressive counseling. Either then or on an earlier occasion, Bryant also told Dishman that "her hand had been slapped" for discussing the counseling, and that "she had been told not to discuss it." (Def. SOF ¶ 72).

That same afternoon, Bryant was informed that her employment was being terminated. (Id. ¶ 78). Bryant was told that Dollar General had learned she had talked with Dishman about her progressive counseling document after she had been told to keep the progressive counseling confidential. (Def. SOF ¶ 79). In the Personnel Action form filled out by English, he checked the box for "not meeting performance standards." He did not check the boxes for "inappropriate conduct," "insubordination," or "violation of company policy/procedure," although in the comments section he did write that "employee shared confidential information after being told not to do so." (English Depo. Ex. 6).

Dollar General claims that Bryant was terminated because Dollar General had learned from Dishman that Bryant had continued to discuss her progressive counseling, even though she had just been told not to discuss the matter. Bryant claims she was

8

terminated because Dollar General regarded her as disabled and in retaliation for exercising her rights under the FMLA.

Plaintiff asserts that her diabetes, high blood pressure and heart condition led Dollar General to believe she was substantially limited in her ability to work. (Def. SOF ¶ 82). With regard to that belief, Bryant testified in her deposition as follows:

> Q. So it sounds like in your mind, the activity that Dollar General viewed you as being limited in was the activity of working. Is that fair to say?
> A. Working at that position, I would think.
> Q. And what position was that?
> A. Senior programmer/analyst.

(Bryant Depo. at 154). Plaintiff has no idea how Dollar General perceived her abilities to perform other jobs outside of Dollar General's IS Department. (Def. SOF ¶ 94).

Bryant also testified that at the time she was terminated, Campbell told her that "because of the stress of this company – and the stress is going to get worse. Because of your health, you can't do the job" or "you're not going to be able to do the job." (Id.; Bryant Depo. at 153). Bryant claims her supervisors also told her numerous times, "we know you are sick and we don't want to make you sicker" and those statements were made towards the last six months of Bryant's employment. (Id. at 164-68, 194-95). Bryant further testified she believed Dollar General's forcing her to complete FMLA papers two years after it knew of her conditions demonstrated that Dollar General regarded her as disabled. (Id. 170-71, 179-180).

9

## II.  **STANDARD OF REVIEW**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In

10

ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. LEGAL ANALYSIS

#### A. Claims under the ADA

Bryant claims that she was terminated because she was perceived as disabled within the meaning of the ADA. She also claims she was subjected to a hostile work environment in violation of the ADA and was not offered a reasonable accommodation as required by the ADA.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Merely having an 'impairment' does not make one disabled for purposes of the ADA." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002). Instead, to establish a disability within the meaning of the ADA a plaintiff must establish "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individuals; (B) a record of such an

11

impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Major life activities are ""functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). One is "substantially limited" if he or she is "(1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).

In this case, Plaintiff claims she was perceived as disabled with regard to the major life activity of working. The only evidence before the Court is that if Plaintiff was in fact perceived as disabled in relation to working, that perception was limited to the job of a computer programmer/analyst at Dollar General. This perception dooms Plaintiff's ADA claim.

The Sixth Circuit "has repeatedly held that the major life activity of working is not substantially limited simply because an employee's physical or psychological impairment prevents him from performing a particular job." Agnew v. Heat Treating Serv. of America, 2005 WL 3550532 at *5 (6th Cir. 2005)(collecting cases).

12

"To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 491 (1999).

In this case, both Bryant and her supervisors tied Bryant's alleged disability to the job of a senior programmer/analyst at Dollar General and the stress entailed in that position. As indicated previously, in her deposition, Bryant testified:

> Q. So it sounds like in your mind, the activity that Dollar General viewed you as being limited in was the activity of working. Is that fair to say?
> A. Working at that position, I would think.
> Q. And what position was that?
> A. Senior programmer/analyst.

(Bryant Depo. at 154). Bryant also testified that Campbell told her "because of the stress of this company – and the stress is going to get worse. Because of your health, you're not going to be able to do the job." (<u>Id</u>.).

Plaintiff has no idea how Dollar General perceived her abilities to perform other jobs outside of Dollar General. (Def. SOF ¶ 94). Even in her brief in opposition to the Motion for Summary Judgment, Bryant reiterates the notion that the stress at Dollar General (as opposed to at some other company) was the reason she was perceived as being unable to work, writing:

> [I]t is significant that Campbell told Ms. Bryant on the afternoon that she was fired that, "[b]ecause of the stress *in this company* – and the stress is going to get worse. Because of your health, you're not going to be able to do the job." (Bryant 154). Campbell also may have

13

> told Ms. Bryant that "*our job* at Dollar General is always
> stressful." (Campbell 75). Likewise, English testified
> that "[w]e are all under stress [at Dollar General]."
> (English 51).

(Docket Entry No. 26 at 20).[6]

"Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA." Ross v. Campbell Soup Co., 237 F.3d 701, 709 (6th Cir. 2001). "Not only must a plaintiff demonstrate that an employer thought [s]he was disabled, [s]he must also show that the employer thought that h[er] disability would prevent h[er] from performing a broad class of jobs." Id.

In quoting the foregoing, the Court recognizes that the Sixth Circuit in Ross also indicated that whether an employer regarded an employee as being disabled in the major life activity of working "is a question embedded almost entirely in the employer's subjective state of mind" id. at 709 and hence not generally a basis for summary judgment. However, Plaintiff reads Ross too broadly in suggesting that the degree to which an employer views an

---

[6]Bryant attempts to utilize these deposition excerpts to show that her tasks were not limited to computer programming, but were much broader than that. However, there is no evidence to support such a contention and her own testimony indicates that her job as Senior Programmer/Analyst related solely to drafting and editing computer programming and performing tasks to analyze, test, implement and fix computer programs with respect to the financial and inventory side of Dollar General. (Bryant Depo. at 25-26). This job fit with her educational background (a degree in data processing) and her prior employment in the computer field. (Id. at 10-11).

14

employee's alleged disability is always a jury question. (Docket Entry No. 26 at 19-20). See e.g., Dunaway v. Ford Motor Corp., 134 Fed. Appx. 872, 877 n. 3 (6th Cir. 2005)(Ross does not preclude summary judgment where plaintiff "did not even present a modicum of evidence the employer perceived him as disabled under the ADA"); McElroy v. Philips Medical Sys., 127 Fed. Appx. 161, 169 (6th Cir. 2005)("Unlike Ross, the evidence presented in this case is not sufficient to lead a rational trier of fact to find Philips believed McElroy had a disability that would prevent him from performing a broad class of jobs"); Cotter v. Ajilon Services, Inc., 287 F.3d 593, 601 (6th Cir. 2002)(distinguishing Ross and concluding "[u]ltimately, Cotter has not offered sufficient evidence to support a conclusion by a rational trier of fact that he was disabled or regarded as disabled within the meaning of the ADA"); Rodgers v. Norfolk Southern Corp., 304 F. Supp. 2d 961, 971 (S.D. Oh. 2003)(even in light of Ross, summary judgment was appropriate where "the undisputed evidence shows that the Defendant concluded Plaintiff was unable to perform one particular job, that of extra board engineer").

In this case, the only evidence before the Court relates to Bryant's ability to do the Senior Programmer/Analyst position at Dollar General. However, to establish her ADA claim, Plaintiff must show that Dollar General "perceived h[er] as unable to work in a broad class of jobs or a broad range of jobs in various classes."

Moorer v. Baptist Memorial Healthcare Sys., 398 F.3d 469, 480 (6th Cir. 2005).  Likewise, to establish a failure to accommodate or a hostile work environment claim under the ADA, plaintiff must have (or be regarded as having) a disability within the meaning of the ADA.  See, Gerton v. Verizon South, Inc., 145 Fed. Appx. 159, 164 (6th Cir. 2005)("[i]f the plaintiff fails to establish a prima facie case, it is unnecessary to address the question of reasonable accommodation"); Huge v. General Motors Corp., 62 Fed. Appx. 77, 81 (6th Cir. 2003)("Inasmuch as the existence of a statutorily-defined disability is a requirement of accommodation and discrimination claims under the ADA, as well as for any hostile environment claim under the statute . . . the absence of a triable issue with regard to disability is sufficient to affirm the district court's entry of summary judgment on all of those claims").[7]

Proof of a disability is a threshold requirement to prove a violation of the ADA.  Burns v. Coca-Cola Enterp. Inc., 222 F.3d 247, 253 (6th Cir. 2000).  Plaintiff has not established that she was disabled, or perceived as disabled, within the meaning of the

---

[7]Even without the requirements for a *prima facie* case, Plaintiff's hostile work environment and retaliation claim would fail, the former because there is no showing that the harassment was pervasive or severe such as to alter the conditions of her employment, see, Trepka v. Board Of Educ., 28 Fed. Appx. 455, 461 (6th Cir. 2002) and the latter because it does not appear that an employer in the Sixth Circuit has to accommodate a perceived disability.  Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999).

16

ADA and therefore Defendant is entitled to summary judgment on her ADA claims.

## B. <u>FMLA RETALIATION/DISCRIMINATION CLAIM</u>[8]

The FMLA entitles an eligible employee up to twelve weeks of leave during any twelve month period if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(C)&(D). "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

Under the Regulations, "[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave" and "cannot use the taking of FMLA leave as a negative factor in employment actions[.]" 29 C.F.R. § 824.220(c). "This prohibition includes retaliatory discharge for taking leave." <u>Arban v. West Publ'g Co.</u>, 345 F.3d 390, 403 (6th Cir. 2003).

_____

[8]The Sixth Circuit "recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." <u>Killan v. Yorozu Automotive Tennessee, Inc.</u>, 454 F.3d 549, 555-56 (6th Cir. 2006) (quoting <u>Hoge v. Honda of America Mfg.</u>, Inc., 384 F.3d 238, 244 (6th Cir. 2004)). This case presents a retaliation/discrimination theory of recovery under the FMLA and those terms are used together or interchangeably herein.

In <u>Skrjanc v. Great Lakes Power Service Co.</u>, 272 F.3d 309, 315 (6th Cir. 2001), the Sixth Circuit indicated that a court should apply the <u>McDonnell Douglas</u> burden-shifting framework to FMLA retaliation claims that are based upon indirect evidence. Under that framework, the Plaintiff must first establish a *prima facie* case, with the burden then shifting to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. <u>Gibson v. City of Louisville</u>, 336 F.3d 511, 513 (6th Cir. 2003). If the employer articulates such a reason, the "Plaintiff must show that this nondiscriminatory reason was in fact pretextual and that unlawful discrimination was the real reason for the adverse action." <u>Id</u>. "To survive summary judgment, [Plaintiff] must provide sufficient evidence to show that the exercise of her FMLA rights was a motivating factor in her discharge." <u>Heady v. U.S. Enrichment Corp.</u>, 146 Fed. Appx. 766, 769-770 (6th Cir. 2005).

To establish a *prima facie* case of retaliation/discrimination under the FMLA, it is incumbent upon Plaintiff to show (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. <u>Id</u>. Sixth Circuit precedent provides that "[t]he burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 563 (6th Cir. 2000).

Given that the burden is not onerous, this Court finds that Plaintiff has presented sufficient evidence to establish a *prima facie* case. There is no question but that Plaintiff suffered an adverse employment action since she was terminated. As for engaging in statutorily protected activity, Bryant took FMLA leave just a few days before her termination.

The primary area of contention with regard to a *prima facie* case is the question of a causal connection between Plaintiff's termination and her request for FMLA leave. The Court concludes that this is a jury question because material issues of fact exist in the record. Such facts include:

- Tucker and English commenting to Bryant in the last few months of her employment that they knew she was sick and didn't want to make her sicker.

- Tucker and English had discussed Bryant missing deadlines and Bryant had been counseled about this problem. Bryant faced another deadline on April 30, 2004 in relation to finishing her assigned tasks on the DCT project which the group was working on that day. The deadline was missed after Bryant had an argument with her co-workers about who was causing a lack of progress in meeting the deadline that day. The next day, Plaintiff began her scheduled week's vacation. Bryant took FMLA

19

leave from May 19 to May 23, 2004. She was terminated on May 27, 2004.

• English's "Progressive Counseling Notes" which contain references to the times Bryant was away from work after the progressive counseling session and which contained a specific notation that Bryant was urged to complete her FMLA paperwork.

• Campbell telling Bryant on the afternoon of her termination "because of the stress of this company – and the stress is going to get worse. Because of your health, you can't do the job" or "you're not going to be able to do the job.

• The temporal proximity (a few days) between Plaintiff's discharge and her taking of FMLA leave.

Taken in isolation, these events and statements may appear innocuous and may be explained away. One can be viewed as incongruous with an intent to retaliate, e.g., it would not be expected that one would be encouraged to fill out FMLA paperwork, only to be retaliated against for taking FMLA leave shortly thereafter. However, taken together a jury could believe these events paint a picture of possible retaliation based upon Bryant having availed herself of her statutory right to FMLA leave.

Defendant asserts that even if Bryant can establish a *prima facie* case of retaliation under the FMLA, it has advanced a

legitimate non-discriminatory reason for Plaintiff's discharge which Plaintiff cannot show to be pretextual. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dew v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).

In this case, jury questions are presented on the issue of whether the proffered reason for dismissal – Bryant's discussion of progressive discipline with Dishman – actually motivated Dollar General's actions or had any basis in fact. In the Personnel Action Form, English checked the box for "not meeting performance standards," not the boxes for "inappropriate conduct," "insubordination," or "violation of company policy/procedure." While the comment section states that Bryant improperly shared confidential information, that is not the checked reason for her dismissal. From this evidence, a jury could determine that the reason for dismissal was not, in fact, Bryant's discussion of progressive counseling. See, Cicero v. Borg-Warner Automotive, Inc., 280 F.3d 579, 592 (6th Cir. 2002)("Shifting justifications over time call the credibility of those justifications into question").

Additionally, it appears it was common for employees to discuss their progressive discipline with each other and there apparently was no specific policy prohibiting such conversations. A jury question is presented as to whether the actual reason for

21

terminating Bryant was her discussion of her progressive counseling with other employees, particularly since it appears that no other employee was fired for such discussion.

Further, there is an issue as to whether Bryant actually discussed her progressive discipline with Dishman in violation of the instructions given to her. A fair reading of Bryant's deposition testimony suggests that she understood she could not talk any further about the progressive counseling document and that on the morning of her firing she told Dishman that she had had a meeting but that she could not talk about her progressive discipline. (Bryant Depo. at 134-141). If such testimony is to be believed and Dollar General's testimony to the contrary rejected, a jury could conclude that the given reason for Bryant's discharge has no basis in fact.

In sum, jury questions are presented on the issues of the causal connection between Bryant's taking of FMLA leave and her discharge and whether the reason given for her discharge was pretextual. As such, summary judgment will not be granted on Bryant's FMLA retaliation claim.

One more issue needs to be addressed. Defendant argues in its brief in support of its Motion for Summary Judgment that Bryant cannot establish a claim for FMLA harassment because such a cause of action does not exist and, even if it did, Bryant has presented insufficient evidence to prevail on such a claim. Bryant does not respond to those arguments and it is not clear from her Complaint that she is even claiming FMLA harassment. However, even if she is

maintaining such a claim, Defendant is entitled to summary judgment.

Some courts have referenced a claim for FMLA harassment, albeit with little or no discussion. See, McGregor v. Autozone, Inc., 180 F.3d 1305, 1306 (1999)(plaintiff claims "retaliatory harassment for attempting to exercise her FMLA rights"); Dage v. Time Warner Cable, 395 F.Supp.2d 668, 676 (S.D. Ohio, 2005)("Plaintiff has now abandoned any claim based on a theory of retaliatory harassment under FMLA"); Whitlow v. Visiting Nurse Ass'n, 420 F.Supp.2d 92, 114 (W.D.N.Y. 2005)("plaintiff requests for the first time in this litigation that the court construe the complaint to include a claim for discrimination or harassment under the FMLA").

Assuming such a claim exists independent of a retaliation or interference claim under 29 U.S.C. §§ 2614 & 2615, and ignoring that Plaintiff has abandoned such a claim by failing to respond to Defendant's arguments, Dage, 395 F.Supp.2d at 676 (collecting cases), the Court finds insufficient evidence in the record to present a jury question on whether Bryant was harassed for taking FMLA leave.

To establish harassment in the employment context, Plaintiff must show that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys. Inc. , 510 U.S. 17, 21 (1993). Factors to be considered in determining

whether the harassment is severe or pervasive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002).

In this case, Plaintiff identified the following as harassing conduct: (1) Tucker talking to Plaintiff about missing deadlines; (2) Tucker telling Plaintiff that "I had to get this stuff done no matter whether I was sick or not"; (3) English questioning Plaintiff about taking time off after she had brought him a doctor's note; (4) comments by Tucker and English to Plaintiff's co-workers not to help Plaintiff with her work; and (5) Tucker and English "talking with people and getting false comments" from her co-workers." (Bryant Depo. at 184-192).

As Defendant correctly observes, none of these allegations come anywhere close to the types of behavior that the courts have found to be severe and pervasive harassment. The first three of these alleged acts – discussions with Plaintiff about her deadlines and a discussion with Plaintiff about time off – do not constitute harassment as that term has come to be defined in the employment context. See, Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir. 1998)("Conversations between an employee and his superiors about his performance does not constitute harassment simply because

24

they cause the employee distress"). The other two alleged acts were not even directed at the Plaintiff but were comments to co-workers. In any event, there is no evidence Plaintiff "was ridiculed or insulted because of h[er] medical condition to the point that it permeated h[er] working environment." <u>Plautz v. Potter</u>, 156 Fed. Appx. 812, 819 (6th Cir. 2005). As such, Defendant is entitled to summary judgment on any claim for harassment under the FMLA.

### IV. <u>CONCLUSION</u>

On the basis of the foregoing, Defendant's Motion for Summary Judgment (Docket Entry No. 18) will be granted with respect to Plaintiff's claims under the ADA and any claim for harassment under the FMLA, but denied with respect to Plaintiff's claim for retaliation/discrimination under the FMLA.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

Case 3:05-cv-00840   Document 31   Filed 08/31/06   Page 25 of 25 PageID #: 1205